Transportation, Inc. v. Norfolk Southern Railway Company. Mr. Rothfeld, whenever you're ready. I thank you, Your Honor. It may please the Court. I'm Charles Rothfeld, the Mayor Brown. The key point in this case is that the defendants committed continuing violations of law into and through the statute of limitations period, and that continuing renewed Sherman Act violation caused continuing additional new injury to CXS within the limitations period, over and over again, year after year. And that combination of continuing antitrust illegal activity in the limitations period, new injury to the plaintiff within the limitations period. Is it agreed or conceded that from 2010 to the events in 2015, there's no request, no communication either way about the switch rate? So that your theory, and I think you're using the word continuing, so it sounds like at least during that period, your theory is entirely on the fact that the decision that was made to increase the rates in 2009 continued year after year. Am I understanding your argument correctly? That is correct, Your Honor, but to be clear, when we say it's continuing violation, the same thing happened over and over again. This wasn't the posted rate, this was a tariff rate that was stated by the Beltline. It was the rates on their website. There's no doubt that it controlled the activities at the NIT, at the Norfolk International Terminals. And so the same thing was going on over and over again. It was the demand for this rate. The demand for that rate is what kept CSX out of the terminal, made it impossible for CSX to engage in competition for contracts with shippers that had the opportunity to use on-deck access at the terminal. Do you agree that there had to be an overt act within the statute of limitations in order to satisfy the statute, or do you disagree with that? We agree that there have to be continuing actual illegal activity and injury, both within the... Nothing else in terms of an overt act occurred after that, so do you disagree with that? Well, we disagree with the district court's understanding of what constitutes an overt act for purposes of re-triggering the statute of limitations. We think that there are kind of three elements here, each of which qualify as overt acts of harmful acts. One is the continuation of the demand for the excessive anti-competitive rate. Again, that is, I think, is active conduct. That is current demand governing the activities at the terminal. It's a demand that appears on the website, on the stated tariff of the Beltline, one of the defendants here. So we think that that constitutes sort of a conscious, deliberate determination by the defendants that they are going to continue demanding this rate within the limitation period for the purpose of excluding CSX from doing business at the terminal. So we think that, in and of itself, is an active overt act. Is the best case you have for that... I know you cite the Hanover case some, but I think you would probably agree that at least factually there's interaction between the parties that would differ. You may not agree, but that's a distinction that makes a difference. But I'm just trying to bracket Hanover, because I think that's a separate situation. Do you have a case other than the Third Circuit, I forget the name of it, case that talked about the docking arrangements that supports your proposition that the continuation of something that happened earlier constitutes some continuing overt act? We do, Your Honor. And to be clear, the Lower Lake Erie case that you mentioned with the Third Circuit is, we think, factually, precisely on point here. So that is kind of strong support for a position. But there are cases like the Fifth Circuit's case. Which one is that, sir? Poster exchange, which is discussed in the briefs. And that was a refusal to deal case in which the Fifth Circuit said, so long as the refusal to deal is continuing. Now, there had to be some indication. The court said, in act or word, indicating that the refusal is continuing. Simply to demonstrate that the conspiracy, the wrongful conduct was going on. Here we have that, undoubtedly, because we have the stated rate being demanded in the tariff on the website of the defendant. So I think that is kind of strong support. As the Third Circuit pointed out, in the Lower Lake Erie case, it is not uncommon that antitrust violations are accomplished through inaction. Through a refusal to do something. And that the injury is inflicted by the failure to act. That is the case in a boycott. That's the case in a refusal to deal. That's the case here. So how do you reconcile those cases with the Zenith case that your colleague on the other side relies on? And the district court relies on? Zenith, I think, simply states the general continuing violation doctrine. Which is, there has to be something that happened in the limitations period. There has to be wrongful conduct that caused injury. And there is, again, absolutely no doubt that that is the case here. It was the continuation of the rate, the exclusionary rate, that kept CSX from doing business in the terminal. There is no doubt that that occurred. Why isn't that just a, I mean, the damages are continuing from the date of the initial overt act. But there is nothing else that the defendant has done, other than that initial act, which has caused this damage to extend over a period of time. Well, let me say two things about that, General. One is, I don't want to forget about the point that was raised by Judge Ottobaum, but that in 2015, and again in 2018, there actually were additional concrete overt acts, things that the defendants did, which demonstrate, I think, also beyond doubt, that the conspiracy, the monopoly was continuing. And the wrongful conduct was continuing, and it was continuing to cause injury. So I think those are kind of in a separate bucket. Those are really clearly active overt acts, if that's necessary. But maybe sort of the more direct response to you is that, again, the maintenance of the rate. I mean, it's not that, we're not seeking damages for things that occurred in 2010. I mean, bad things happened in 2010, and statute has run on those, because you can only seek damages for injury that was inflicted within a limitation period. Everybody agrees on that. And that, I think, is what Zenith stands for, that proposition, that it kind of gets cut off at that point. But the injury here is injury that occurred in the limitations period in 2014, in 2016, in 2018, up to the current day, because they are continuing to do the same illegal thing, day after day, year after year, and it's having the same exclusionary effect on CSX, day after day, and year after year. Why isn't the analogy to Charlotte Telecasters persuasive on that point? There was this non-exclusive ordinance, and the plaintiff didn't get a license under it, and then continued, day after day, year after year, during the limitations period, to be excluded, because they didn't have a license. But it was not exclusive. You know, they could have, there was always the possibility that the next day, they could receive one. It wasn't a final, you know, inevitable decision that happened before the limitations period. And what's your distinction between that case and this case? Well, I have two distinctions, Your Honor. One is, we have here the events of 2015 and 2018, which are sort of active events that no parallel at all in the Charlotte case. I think, which is sufficient, I think, because that retriggers the statute of limitations, and that was not present there. In addition, I mean, here, the injury that you're referring to, that was a continuing injury kind of inflicted initially at the time that the bad thing happened. Here, again, we are not seeking damages for things that happened in 2010. We are seeking damages for the continuation of something that the defendants are doing right now, which is they are continuing to demand this rate. But aren't they both, I mean, they're both cases where a decision was made, the bad thing happened, as you say, and then the plaintiff says, that decision continues to exclude me for a number of years because there was no additional decision. Nothing was changed, right? In this case, the rate continued to be the same, and in that case, the city council never reconsidered their decision, even though they had said, we will give it some thought. They never changed their minds. And both of these are situations where the act happened, and then there were, because of that act, the plaintiff continued to be excluded. I guess I'll, again, say two things about that. First, not to forget the 2015-2018 acts, which are, we think, dispositive and controlling and distinguished. Charlotte. I guess the other thing I would say, we understand what the defendants are doing here has been different in nature from what the Charlotte City Council did there. I mean, there it sort of effectively was sort of one and done. It awarded the franchise to the competitor of Charlotte Telecasters, and as this court said, that was sort of the end of it. Silence followed from that. Here, we are, they're not being silent. They are posting on their website, you know, posting on their tariff demand. This is our rate, and if you want to do business here, you have to pay that rate. And so I think that is sort of more of an active interaction with customers. So your theory is that the daily posting of the rate is the overt act? Well, the continuous demand for the rate, as to that part of our argument, again, 2015, 2018 are separate, independent, active overt acts. But we think that a demand for illegal excessive rate, if you want to do business at the terminal, that is something that is happening right now. And I guess a parallel to that is, you know, in a price-fixing case, a monopoly price case, in which the wrongful policy, the price fix is set, could be 10 years ago. In Hanover, it was 40 years ago. And there is no change made to the policy after that. Hanover, the monopoly practice continued unchanged for 40 years. Yeah, but the damages all mattered. So it seems like the law would suggest that your theory of relief matters. In Hanover, I think they were seeking the difference of a sale and a lease each time. And so as that continued, there were damages related to that. I think that gets into your 15 and 18 arguments. And you mentioned those several times. I'd like to start first with the 2018 argument, if you will. Assume that the proposal of the lower rate and that subsequent activity was an overt act. How would the jury have been able to determine that the anti-competitive effects of what happened in 2018 were different or separate from those that happened before them, based on at least what we know from the experts' report to date? Does my question make sense? Assume the last resort is 2018. And I agree with you that that's an overt act. And I disagree with the district court that not voting is enough. I think silence is enough. So I'm now trying to figure out, have you met your burden of proof on damages? And I know you have damages on the chart that says 2018 and the years past that. But how would a jury be able to determine that those 18 and beyond damages were for the 2018 events and not the events that, in my hypothetical, are time-barring? Well, I think that if 2018 is an overt act, it kind of restarts the statute of limitations for the conspiracy, for the monopoly. And so I think everything going forward from that. It's not just a time thing. If you read the law, and sometimes it's in a lawful versus unlawful context, and this may be slightly different because it's in a time-barred versus a permissible context under this hypothetical. I think it's fair to say you've got to prove that the damage you're seeking are caused by your overt act. And you've alleged that you have all these damages going up into 2018. But in my hypothetical, they're time-barred. And so what makes the jury be able to tell that from 18, those damages are attributable to that? What happened right then versus what had happened eight years before? I see that my opening time has expired, but if I answer this question, Your Honor, I'll preserve the remainder. I guess I have two quick responses to that. One is we disagree with the proposition that the damages have to relate directly to the overt act that occurred in that year. Our understanding of the law is that if there is an overt act, that kind of re-triggers the limitation period for the entire conspiracy or entire monopoly. And so kind of everything that takes place related to the monopoly and to the conspiracy is kind of fair game again. The other thing I would say about particular facts here is the damage, if the overt act is the exclusion from the terminal, 2018 and afterwards, the exclusion from the terminal, all the damages are the same. It's our inability to compete for contracts, our loss of contracts for that period. And so if the overt act in 2018 kind of restarts everything, then the damages are going to be the same, whatever you're looking at, because the damages are our exclusion from the terminal causing our loss of contracts. And so our expert has identified contracts that have been lost as a consequence of the exclusion. And that, I think, is the answer to your question. We're entitled to our injury from loss of contract. Thank you, sir. Thank you, sir. Mr. Dvoretsky. Good morning, Your Honors. May it please the Court. I'm Shai Dvoretsky with Skadden Arps for Norfolk Southern. Mr. Snow will argue on behalf of Beltline for five minutes. Let me start with the 2015 and 2018 acts and explain why those are not overt acts that restart the limitations period on CSX's time-barred claim, which is based on the adoption of the 2010 tariff in 2009. First, as to 2015, as Mr. Rothfeld just said, the exclusion that CSX is alleging here, the harm that CSX is alleging, is the exclusion from the market. The 2015 payment of the rate a handful of times doesn't comport with that theory. CSX only sued as a competitor. It paid the rate a handful of times in 2015, but CSX hasn't advanced a theory of harm predicated on the payment of a supposedly super competitive price. The fact that CSX paid that price showed that it was actually participating, not excluded. So 2015 doesn't help them. With respect to 2018... Can I stop you there? Sure. I understand that point. What's the case? Is there a case that articulates that well? I certainly understand. I think what you're saying is that they're alleging an act in 2015 about paying an increased rate. I think your argument is, if that's your overt act, your damages theory doesn't really relate to an increased payment those handful of times. So while I understand your argument, I guess logically, is there a case that directly says that? That if your damages theory is one thing, it can't be an overt act for a separate type of remedy? Not specifically in the overt act context, but the cases that I think come closest would be this court's decision in Actelion, which also cited and quoted the Second Circuit's decision in Berkey Photo. And both of those cases recognize that customers and competitors are suing on different theories of harm. A customer is harmed when it pays a super competitive rate. A competitor is harmed when it is excluded from the market. And that has implications, as this court recognized in Actelion, for how the limitations period is determined. So that's not specifically in the context of restarting a limitations period based on an overt act. But those cases do recognize that when you're assessing a limitations period, which depends on when the cause of action accrues, that does depend on what your theory of harm is, which is going to be different for customers versus competitors. And so there's discussion about this customer versus competitor issue. And I take it an entity could be both, right? I mean here, CSS could be a competitor and a customer. And so what drives the equation is what sort of remedy they're seeking. Is that how we look at it? That's right. And it's very much like a situation where an individual or a party can sue either for breach of contract or for a tort claim arising out of the same operative facts. But you would assess the cause of action and you would consider any limitations issues depending on what kind of claim they are bringing. And whether you're bringing a customer claim or a competitor claim, there's just a different theory of what the injury is. I think I get your point, but normally if there's a contract claim, there's an economic loss rule that probably prohibits a tort claim. So I'm not sure that analogy works out. But I think there are other situations I think it probably does. And the plaintiff might make the wrong choice in suing on contract versus tort. It might be foreclosed because of that. But they'd be choosing one theory or another, and the court would assess their claim and any limitations implications based on the theory that the plaintiff is choosing to pursue. With respect to 2018, two points on 2018. First, as to why it wasn't an overt act. And second, as to why even if it was an overt act, it's not sufficient to restart the limitations period. It wasn't an overt act because CSX never moved. This is undisputed. CSX never moved for a rate committee or for a lower rate. Corporations like Beltline act through formal motions. The district court recognized this at joint appendix 349 of footnote 28. Under Virginia corporate law, a corporation is required to act through formal board resolutions. So why isn't submission of a... That seems an awful technical way of going about this. I mean, they submitted a rate proposal. And you're saying because someone didn't get up and say, I hereby move and follow the Robert's Rules of Orders, that's going to dictate overt acts? I mean, that seems extremely technical. I'm not sure that makes a lot of sense to me. I don't think it is overly technical, Judge Quattlebaum. What happened here is that CSX raised the possibility. There was some discussion. They didn't raise the possibility. They asked for it. The district court said that the CEO of the defendant company was somewhat receptive, and I think that's the word. And then they went forward, and then they demanded the shareholder changes and all that. But there was no question, I don't think, that CSX made a proposal for a rate decrease. Maybe once they got further, they may not have renewed it in a formal motion, but the event that precipitated everything was a request for a rate increase. So Judge Quattlebaum, you mentioned that there was a proposal for... There was a governance proposal. There was a governance proposal. The governance proposal was made through a formal motion by CSX. That's a joint appendix 338. So they knew how Beltline operated. They knew how to make a motion. It's not a difficult thing to do. But with respect to the rate decrease and the rate committee, they never followed through. To use another example, it's as if I can't sue my insurance company over a denial of a benefit without submitting a claim. I can't just have a conversation with the agent on the 800 number, go with whatever that person says, and then after that, go to court. There are values... What if I call you and say I got a claim, but I don't submit a formal written submission for a claim? Are you saying that wouldn't be... Put someone on notice that there's an act? I don't think that the beneficiary in that situation, based on whatever the representative tells them over the phone, could then go to court and say, the insurance company denied my claim because somebody told me that they weren't likely to pay it. I think in that situation, the law would require that person to file the claim form, get the formal denial, go through the processes that are required, and then go to court. Corporations act in much the same way, and as the district court also noted correctly, this is again joint appendix 349, note 28, the NPBL board conducted its business in a formal manner in keeping with Virginia statutory requirements. This was a tariff rate that was set initially by board vote. That's at joint appendix 184 to 185. And in order to be changed, there would have to be a board vote. And CSX simply never followed through on that process. Can I ask a hypothetical about that? So there's a board vote to increase the rate in 2009, and let's say 10 years later the board acquires information that suggests that efficiencies have improved so much, or at least enough, that the rate can in fact be decreased. And I don't imagine a corporation would ever perhaps, maybe they do, but some sort of facts that suggest there's a possibility that we can still make a sufficient profit while decreasing the switch rate. And then the board says, well, we're not going to do it. And they take a vote on that and maintain the rate. Is that a new overt act? So I think that triggers the question about whether a reaffirmation can be an overt act. The majority of circuits that have considered this question have said that a reaffirmation, simply maintaining the same rate, is not an overt act. The reason for that is that no matter how considered or how deliberate they are in deciding whether or not to do it. Correct. Because it is the same injury as what happened in 2009, again, on a competitor theory. If the theory is that CSX was excluded from the market by the setting of the rate, nothing different has happened. The same rate is in place 10 years later, even if the board has said we're going to keep it in place. But again, the court doesn't need to reach that because it never got that far in this case. It never got to a motion. Can I ask a sort of broader policy question? You make some really good arguments about the importance of statute of limitations, and we all know that they're intended to make sure that plaintiffs are incentivized to bring their claims promptly so that witnesses don't disappear and evidence doesn't disappear and the like. But what about the counter that at least the sort of limitation here on the other side is that they can't go back and sue for those damages that because of the passage of time might make it difficult for a defendant to rebut, but they're limited to the window of time within which they actually filed a claim. Why isn't that a sufficient protection? I think part of the policy for why we want competitors to sue at the earliest opportunity, it goes back to what the antitrust laws are trying to achieve. The antitrust laws are not about protecting competitors and letting a competitor like CSX sleep on its rights for a decade and then still be able to collect damages going back four years. The antitrust laws are about protecting competition for the benefit of consumers. And you best protect consumers by incentivizing competitors to bring their claim as soon as they know that they are injured, as soon as there is the action, in this case in 2009, that supposedly excluded them from the market. So yes, the limitation to the four-year window is some incentive for CSX to sue earlier, but it's not enough of an incentive. They're still seeking to recover hundreds of millions of dollars in damages here based on even the more limited window. So who's got the incentive to protect the consumers in this case? Now, under your theory, the one party with the most interest in assuring a competitive marketplace is out of court. So the United States can seek injunctive relief at any time. There's no time limitation on that. In addition to that, the Surface Transportation Board, either on its own motion or as a result of the complaint by the parties, can review the rate and make sure that it's reasonable. In fact, in this very case, there was a pending proceeding before the STB to review the underlying components of the rate, and CSX actually asked to have that stayed pending this litigation. So there are other mechanisms in order to ensure the reasonableness of the rate. They simply don't include a competitor sleeping on its rights for a decade  Counsel, could you please assume, just for the sake of clarification, that I'm not persuaded by your formal requirements of a motion and a response. I raised the question with your colleague about how would a jury know what the damages are from the 2018 event as opposed to time-barred events. And counsel said, well, it's the same damages. Could you please respond to that 2018 event from a damages standpoint? Yes, and that was going to be the second point that I was going to get to on 2018. Professor Marvell's reply report, this is a joint appendix 230, says, quote, the source of the damages, I estimate, is the totality of NS's and NPBL's efforts to foreclose CSX rather than NPBL's exorbitant switch rate alone. So he's not purporting to isolate the cause of the harm as just the switch rate. And in particular, to give you an example, the model considered both the effect of the 210 tariff and the shuttering of the diamond track. The diamond track was shuttered back in 2009. CSX alleged anti-competitive harm as a result from that. It's no longer pursuing that claim. And so Marvell's model incorporates both purported harm due to the 210 tariff and purported harm outside the limitations period, clearly not actionable at this point, due to the diamond track. There's no way for a court or for a jury to disaggregate the cause of the harm, even if you assume that 2018 is an overt act that restarts limitations. But that argument would seem to apply to all damage assault from 2010 on. Because if part of it related to shutting down that track, could you disentangle that? I get that point. And I get why that would apply to 2018 as well. But is there anything, is there an argument that with respect to the damages, aside from the inclusion of shuttering that track, that there's an obligation for the jury, for the plaintiff to present evidence to the jury where they can isolate the damages from that 2018 decision as opposed to even the rape decision that had been before it? Well, yes, because even if you assume that the 2018 decision without the board vote isn't over an act, you still have to isolate damages that are attributable to the 210 rate, to the maintenance of the 210 rate within the limitations period. Not damages that are attributable to maintenance of the 210 rate back in 2010 or 2012 or whatever. And Marvell doesn't do that. What he does is he does give you a year-by-year figure. But for each year, he does not disaggregate the cause of the harm within that year. And there's accumulating harm, CSX alleges, due to the maintenance of the 210 rate over this entire decade-long period that, again, Marvell doesn't disaggregate. That's an additional problem on top of the failure to disaggregate the harm that's allegedly due to Diamond Track, which is, again, not actionable conduct. All right, thank you. Counsel. Mr. Snow. Good morning, and may it please the Court. Ryan Snow on behalf of Norfolk and Portsmouth Beltline Railroad Company. Your Honor, we agree with the points just made, except we see the narrowest and most direct reason to affirm the district court as the flawed damages model, the discussion that Mr. Dvoratsky just ended with. And that flaw is dispositive, regardless of the Court's decision on the statute of limitations, and it's fatal to the entire case. And the reason is, even in a continuing conspiracy, damages must be traceable to acts that occurred within the statute of limitations. And CSX's model cannot disaggregate those damages for the jury. That's the holding of Zenith. That's the anti-bootstrapping rule in Clare. And it's conceptually identical to the Supreme Court's holding in Comcast, where they rejected an over-inclusive damages model as a matter of law. And it's also why CSX's reply brief on this point doesn't solve the problem. In their reply brief at 33, they say, well, our model shows losses by year. So just look at the last four years. But the question that the Supreme Court precedent demands we ask is, what caused those losses? Was it conduct within the statute of limitations or conduct outside the statute of limitations? And according to their own expert, the answer is unquestionably both. It's unquestionably both because each year represents losses from all of the conduct that happened before. So 2020, for example, the single number for that year, reflects the effects of conduct that happened back in 2007 with removal of the diamond track, 2009 with setting the rate, and 2010 with implementation of the rate. It's precisely what the Supreme Court in Clare rejected. And I submit, Your Honors, there's a smoking gun on this point, which is Joint Appendix 207. At Joint Appendix 207, that's CSX's opposition brief, the summary judgment down below. CSX acknowledges that their model does reflect the totality of all of the defendant's efforts. That's their word, totality. But it's undisputed that's how it works. Here's what they say, though. Quote, most of these occurred in years after 2013 within the limitations period. Most is not all. In fact, the district court found that most likely... With reasonable certainty, right? It's not absolute certainty. You don't think that's good enough? Not at all, Your Honor. In fact... Let me ask you this, and this is not something that I'm familiar with, but is it possible to disaggregate the damages in a case like this? You know, I think an economist could do it. I haven't tried to recreate the model that they did. We didn't get our economists to do it. But I think that's what's demanded, frankly. I think CSX did this, this way, because they relied on the rule from the Third Circuit in Lower Lake Erie. That was a 1993 case. It said you can look at the effects of past conduct. But four years later, in Clare, the Supreme Court rejected exactly that rule. And it's at 190 in Clare, they say, nor can the presence of the new act help them recover for the injuries caused by pre-1989 acts, for it is in this respect that we find the Third Circuit's rule incorrect. CSX's model is built on that incorrect rule. The district court identified that five times in its opinion. It called it fatally flawed, fundamentally flawed. It said it's a unitary theory that seeks recovery of all anti-competitive acts, regardless of when they occur. And as I said before, it doesn't matter when. This applies regardless of the continuing conspiracy theory. Because the continuing conspiracy theory just talks about timing. You're allowed to file a suit later than you normally would be. But even when you file that suit, you've still got to comply with Zenith and Clare and your proof of damages. And all we have here is a single number for each year that doesn't let the jury do anything in terms of an award except speculate. The result is no viable damages model, and we believe no claim. And Judge Quattlebaum, to respond to some of your points, this same flaw makes overt acts in 2015, 16, and 18 not usable for CSX because there's no way they can show damages flowing from those acts. They're not overt acts that could be used. One quick factual clarification. Our rate is not reevaluated daily. The rate is set, posted in a tariff, and left alone until it's amended. And the only way it's amended is by board action. That's why CSX had to make a motion at that 2018 meeting. We ask you to affirm. Thank you, Mr. Snow. Thank you. Mr. Rothfeld, you've got some rebuttal. Thank you, Your Honor. I know it's late, so I'll be quick. Just a couple of fast points. First, on the 2015 events, and the question of whether or not CSX was proceeding as a competitor or as a customer. I mean, the fact is, as has been pointed out, it is both. It is both a competitor and a customer, which illustrates how peculiar it is to apply a separate rule for a separate limitations rule based on whether you're wearing your customer hat or your competitor hat. I mean, the fact is that the injury, the central injury here, is injury in the loss of business as a competitor. And the events of 2015 are an overt act demonstrating the conspiracy and the monopoly we're continuing through that time. Is it really peculiar? I mean, lots of times, I remember many of these from my previous life. I mean, people would propose alternative damages theories. And so, sure, you can be wearing two hats. You can be a competitor and you can be a consumer. And you could have, I would assume, said, okay, I got competitor damages for this conduct, and I got consumer damages for that conduct. I think the point is it's the nature of what relief you're seeking that kind of informs what the overt acts are. Well, it may have a bearing on whether an overt act has occurred. It may have a bearing on the nature of the damages you get. But it should not have a bearing on the statute of limitations rule it applies to. Here, it is the same act of the defendants that triggers both the competitive and the customer damages. It's having this anti-competitive, unlawful rate. That rate, if you pay it, you're paying too much. If it's so high as it was here that you can't pay it most times, then your damages are different. Your damages are exclusion from the market and loss of contracts and loss of business. But it's the same thing done at the same time by the defendants that are injuring you in both ways. And I think what happened in 2015 is an act, an actual, you know, overt active act by defendants demonstrating the continuation of the conspiracy and of the monopoly. And that triggers, re-triggers the limitation period. As to 2018, I think there is absolutely no doubt that CSX was requesting that the rate be revisited. And the question of whether this was done at the right time by formal motion or not, there is absolutely, as I say, in the record, no question that that's what was being requested. And the response was essentially to throw it in the trash and say we're going to put it aside and not act on it. It cannot make a difference for purposes of limitations rule whether or not there was a formal vote, whether or not the defendants simply decided that they would not act at all. And that was going to give defendants an opportunity to avoid ever re-triggering the statute of limitations by ignoring a request rather than on acting on it. It also, as to 2018, this question of disaggregating the damages, Judge Davis found that if 2018 had been an overt act, that would have re-triggered the limitation period, and that would have allowed CSX to be eligible to obtain all of its damages. There is no doubt, again, that disaggregation is absolutely possible. It can be done by the expert. Actually, we think that it's visible in the expert report now. And as Chief Judge Diaz noted, the damages rule is not that there must be absolute precision in advance of trial. It's simply that it must be possible to come to a reasonably close approximation of the damages and the jury can make the determination. The jury should have been given the opportunity to do that here. On the statute of limitations policy, the question that was raised by Chief Judge Diaz, it is the case, as you noted, that it's always going to be, there will always be a strong incentive for a plaintiff to proceed expeditiously because if they don't, they run the risk of losing damages that accumulate that are outside the limitation period. That is true here. CSX is not pursuing substantial damages that it suffered prior to the limitations period. On the other side of it, the repose that is demanded by the defendants here is not achieved by their rule because they have this bizarre kind of gerrymandering in which they say, well, the customers can sue and the United States can sue for equitable relief, and in most cases, private parties can sue for equitable relief. It's just that in the peculiar circumstances here, we're cutting out CSX, and that does not achieve statute of limitations policy. Finally, one additional point. Mr. Tversky raised the question of the United States taking action. The Supreme Court has made it very clear that it's central to the effective enforcement of the antitrust law is that there be private damages remedies that are available. We cannot rely on the United States. It simply does not have the resources to pursue all people who are violating the term. Thank you. Thank you, counsel. Thank you. I thank all counsel for their able arguments this afternoon. We'll come down and greet you and adjourn for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Albert Diaz, A. Marvin Quattlebaum Jr., Allison J. Rushing